***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Amy L. Pfeiffer and the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the holding of the prior Opinion and Award. However, pursuant to its authority under G.S.97-85, the Full Commission has modified the Deputy Commissioners decision while affirming the holding and enters the following Opinion and Award.
 ***********
Prior to the hearing, the parties submitted a pretrial agreement setting forth the jurisdictional requirements and contested issues. That agreement is incorporated herein by reference.
 ***********
Based upon the entire evidence of record, the Full Commission makes the following:
FINDINGS OF FACT
 1. Plaintiff originally injured his right knee in February 1997 in an incident unrelated to his employment with defendant-employer. He was first seen by Dr. John P. Ternes of the Nalle Clinic on 7 February 1997, at which time plaintiff gave a history of injuring his knee playing basketball. Dr. Ternes physical examination and an MRI revealed a complete anterior cruciate ligament tear. Dr. Ternes recommended an anterior cruciate ligament reconstruction which was performed on 20 February 1997.
 2. Following surgery, plaintiff had an extremely successful recovery. Plaintiff tolerated the procedure well and did well in his post-operative rehabilitation which primarily involved physical therapy for continued strengthening of his knee. Dr. Ternes last saw plaintiff on 22 July 1997 in connection with this surgery. On 22 July 1997, the plaintiff had no swelling, no patellar inhibition or crepititus, a negative pivot shift test (which suggested the ligament was intact), and a stable knee with only two millimeters of anterior translation, which is within the normal range and further suggested the ligament was intact. During the 22 July 1997 examination, Dr. Ternes did find that plaintiffs quadriceps had atrophied, which is not unusual following an anterior cruciate ligament reconstruction. Quadricep atrophy does not reflect instability or on the condition of the knee.
 3. Dr. Ternes authorized plaintiff to begin jogging and running with a brace beginning 22 July 1997. Plaintiff was not having any problems whatsoever with his right knee prior to his injury on 3 May 1998. In fact, plaintiff had been playing basketball without his brace prior to 3 May 1998 and had not noted any buckling or giving way of the knee. Plaintiff did not see any medical provider in connection with his knee subsequent to 22 July 1997 until after his injury on 3 May 1998.
 4. Plaintiff worked for defendant-employer as a waiter and spent approximately ninety percent (90%) of his work time on his feet. On 3 May 1998, plaintiff slipped on a wet floor at work while entering the kitchen area and while carrying a heavy load of dishes. Plaintiff immediately felt his right knee pop and experienced the onset of pain and numbness. After the incident, plaintiff was unable to walk without assistance. He was instructed by his employer to see Dr. Donald B. Goodman at the Nalle Clinic on the same day.
 5. Dr. Goodman took an x-ray of plaintiffs right knee which was interpreted as normal. Plaintiff returned to Dr. Ternes on 8 July 1998, at which time the physician noticed an increase of four to five millimeters in plaintiffs anterior translation compared to on 22 July 1997, an increase that this physician found significant. Plaintiff also had a positive pivot shift, which led Dr. Ternes to the opinion that plaintiff had torn the graft in his right knee. Dr. Ternes ordered an MRI which was performed on 31 July 1998 and revealed not only a partial tearing of the graft but also a tearing of the postural horn of the medical meniscus. With respect to the partial tear of the graft, Dr. Ternes found that the anterior cruciate ligament was now dysfunctional. His recommendation was a second anterior cruciate ligament reconstruction. Dr. Ternes is of the opinion that if plaintiff does not have the recommended surgery, his knee will never become fully functional.
 6. Dr. Ternes saw plaintiff again on 7 August 1998, and plaintiff had virtually the same findings. Dr. Ternes restricted plaintiff entirely from any and all employment as of 7 August 1998, based on his assumption that plaintiff would have the surgery immediately. Dr. Ternes saw plaintiff on one last occasion on 28 May 1999, and at this examination Dr. Ternes had virtually the same recommendations. Plaintiff had not undergone the surgery as of the date of the hearing in the matter.
 7. Dr. Ternes recommended surgery for plaintiff on 7 August 1998 and also recommended that he not return to any work until the surgery could be performed. Following this examination, and despite Dr. Ternes recommendations, plaintiff returned to work with defendant-employer on 7 August 1997 and informed his supervisor regarding his condition.
 8. Plaintiff, who was 19 years of age as of date of the hearing on 21 July 1999, was living with his mother at the time of his injury in 1998. On 7 August 1997, plaintiffs mother was out of town. Therefore, after speaking to his supervisor, plaintiff telephoned his mother to inform her of his condition and the doctors recommendations. While talking to his mother on the telephone about his injury, plaintiff was fired by his supervisor after not hanging up on her as directed by the supervisor.
 9. Defendants contend that plaintiff was terminated for "insubordination. However, the timing and circumstances of his termination are questionable, given the nature of the medical information plaintiff had just received from Dr. Ternes and then relayed to his supervisor. Based upon the totality of the evidence relating to this issue, the Full Commission finds that defendants have failed to produce sufficient evidence upon which it could find that plaintiffs termination was for misconduct or fault for which a non-disabled employee would also have been terminated.
 10. Following his termination, plaintiff was unable to undergo the surgery recommended by Dr. Ternes because he did not have adequate insurance coverage. Also, plaintiff was not offered assistance by defendants in locating suitable employment.
 11. On his own, plaintiff located a job as a telemarketer with Community Funding and attempted to return to work for in this position approximately two months beginning 19 August 1998 and ending 20 October 1998. The telemarketing position normally required sitting for long periods of time and due to his knee condition, plaintiff had difficulty with this aspect of the job. Because plaintiffs supervisor knew of his condition, plaintiff was provided a special accommodation by being permitted to get up and walk around as needed.
 12. Given the sedentary nature of the telemarketing job with Community Funding and the special accommodations given to plaintiff, the wages he earned in that job were not indicative of his wage earning capacity.
 13. Plaintiff then located work, again on his own, with Freeman Distributors selling vacuum cleaners for a two week period beginning 20 January 1999 and ending 2 February 1999. He sold one vacuum cleaner and received $350.00 in commission, but he thereafter had to stop work because of the problems he was experiencing with his knee. This vacuum salesman job was not suitable and plaintiffs attempt to perform it constituted a failed trial return to work.
 14. Plaintiff has not worked in any capacity for any employer since 2 February 1999 because of his impending surgery.
 15. An anterior cruciate ligament tear is almost always associated with a trauma to the knee. The loosening of plaintiffs graft was caused by a traumatic event as opposed to a gradual loosening, as was evidenced by the degree of asymmetry, the substantial difference in motion, and the pivot shift test change, from 22 July 1997 to 7 August 1998.
 16. The re-rupture of plaintiffs anterior cruciate ligament graft and medial meniscus tear was caused by his 3 May 1998 injury by accident.
 17. On 3 May 1998 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer that resulted in a material aggravation of his preexisting right knee condition.
 18. As the result of his 3 May 1998 injury by accident and aggravation of his knee condition, plaintiff has been incapable of earning wages in his former position with defendant-employer or in any other employment for the period of 7 August 1998 through the present and continuing, except for the period he was able to work with Community Funding and Freeman Distributors.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSION OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of his employment on 3 May 1998 when he slipped and sustained a material aggravation of a preexisting right knee condition. G.S. 97-2(6).
2. Plaintiffs disability is to be based upon his capacity to earn wages rather than just his actual earnings in temporary positions. See Radica v. CarolinaMills, 113 N.C. App. 440, 439 S.E.2d 185 (1994). Therefore, the wages he earned in the temporary positions with Community Funding and Freeman Distributors were not indicative of his wage earning capacity and do not support a discontinuance of total disability compensation. Id.; G.S. 97-29.
3. Furthermore, defendants have failed to produce sufficient evidence upon which it could find that plaintiffs termination was for misconduct or fault for which a non-disabled employee would also have been terminated. See Seagraves v. Austin Co. of Greensboro,123 N.C. App. 228, 472 S.E.2d 587 (1996).
4. As the result of his 3 May 1998 injury by accident, plaintiff is entitled to be paid by defendants temporary total disability at the rate of $130.45 per week for the period of 7 August 1998 through the present and continuing until such time as plaintiff returns to work or until further order of the Commission. G.S. 97-29. Defendants are entitled to a credit for the wages plaintiff earned during the two employments with Community Funding and Freeman Distributors. G.S. 97-42. Counsel shall confer and calculate said amount due based on the appropriate employer earning records.
5. As the result of his 3 May 1998 injury by accident, plaintiff is entitled to have defendants provide all medical treatment recommended by Dr. Ternes including surgery. G.S. 97-2(19); G.S. 97-25.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission modifies and affirms the Deputy Commissioners holding and enters the following:
 AWARD
1. Defendants shall pay plaintiff weekly benefits in the amount of $130.45 for the period of 7 August 1998 and continuing until plaintiff returns to work or until further order of the Commission. That compensation which has accrued shall be paid to plaintiff in a lump sum. The award entered herein is subject to the attorneys fee hereinafter approved, and is subject to the credit owed defendants.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of his injury and provide all medical treatment as recommended by Dr. Ternes.
3. An attorneys fee in the amount of twenty five percent (25%) of the award is hereby approved for plaintiffs counsel. Twenty five percent of the amount that has accrued shall be deducted and shall be paid directly to plaintiffs counsel. In addition, every fourth check due plaintiff shall be sent directly to plaintiffs counsel.
4. Defendants shall pay the costs due the Commission.
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
S/___________________ THOMAS J. BOLCH COMMISSIONER
S/___________________ LAURA K. MAVRETIC COMMISSIONER